UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DEBORAH ANDREAS,

                Plaintiff,                                   Hon. Paul L. Maloney

v.                                                     Case No. 1:08-CV-170

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/


**<u>REPORT AND RECOMMENDATION</u>**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and

XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative

record, and provides that if the Commissioner's decision is supported by substantial evidence, it

shall be conclusive.

        Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process.  *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).  The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance.  *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted).  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight.  *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 51 years of age at the time of the ALJ's decision.  (Tr. 29, 89).  She successfully completed high school and worked previously as a waitress and delivery driver.  (Tr. 112, 117, 133-35).

Plaintiff applied for DIB benefits on May 28, 2002, alleging that she had been disabled since August 13, 2000, due to a shoulder impairment, high blood pressure, migraine headaches, and chronic fatigue.  (Tr. 89-91, 111).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 30-88).  On January 13, 2004, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert, Sandra Steele.  (Tr. 631-59).  In a written decision dated April 27, 2004, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 39-50).  As part of his decision, the ALJ found that Plaintiff did not suffer from a severe mental impairment.  (Tr. 49).  Finding that the ALJ did not properly assess Plaintiff's mental status, the Appeals Council remanded the matter for further consideration.  (Tr. 78-80).[1]

---

[1] Following the decision by ALJ Blair, but before the Appeals Council remanded the matter, Plaintiff submitted an application for SSI benefits, alleging that she was disabled since May 7, 2004.  (Tr. 605-07).  On remand Plaintiff's DIB and SSI applications were consolidated into a single application.  (Tr. 15).

On May 17, 2005, Plaintiff appeared before ALJ Thomas English, with testimony being offered by Plaintiff, medical expert, Dr. Robert Brook, and vocational expert, James Engelkes. (Tr. 660-705). In a written decision dated November 8, 2005, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 15-29). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 8-11). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2005. (Tr. 27); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On May 12, 1995, Plaintiff underwent arthroscopic surgery on her right knee to repair a lateral meniscus tear. (Tr. 262-66). A November 21, 1995 examination of Plaintiff's right knee revealed that Plaintiff had made "good" progress in her recovery. (Tr. 259). Plaintiff was cleared to return to "full duty" work with "no restrictions." (Tr. 259).

On January 10, 1997, Plaintiff reported to the hospital complaining of right shoulder pain. (Tr. 254-55). An examination of Plaintiff's shoulder revealed tenderness, but x-rays were "normal" with no evidence of fracture, dislocation, or osseous or joint pathology. (Tr. 252, 255).

On October 21, 1999, Plaintiff reported that she was suffering from a "painful" right shoulder. (Tr. 235). Plaintiff reported that she was unable to lift above shoulder level. (Tr. 235).

An examination of Plaintiff's shoulder revealed "mild" tenderness, but x-rays were "normal" with no evidence of fracture, dislocation, or osseous or joint pathology.  (Tr. 234).

On December 2, 1999, Plaintiff was examined by Dr. Darius Divina.  (Tr. 289). Plaintiff reported that she was experiencing right shoulder pain.  (Tr. 289).  Plaintiff was diagnosed with impingement syndrome and cervical myositis.  (Tr. 289).  Plaintiff was instructed to participate in physical therapy.  (Tr. 289).

On January 10, 2000, Plaintiff was examined by Dr. Divina.  (Tr. 286).  Plaintiff reported that physical therapy afforded her relief and that she was "now doing her home exercises." (Tr. 286).  Plaintiff exhibited "improving" range of motion in her right shoulder and the doctor reported that Plaintiff was "neurovascularly intact" with "no paresthesias." (Tr. 286).  On February 1, 2000, Plaintiff reported that her shoulder "is much better than it was."  (Tr. 284).  Dr. Divina instructed Plaintiff to begin a "weight training program."  (Tr. 284).

On March 14, 2000, Plaintiff was examined by orthopedic surgeon, Dr. Shrirang Lele.  (Tr. 434-40).  Plaintiff reported that she had "pretty good range of motion" in her right shoulder.  (Tr. 436).  An examination of Plaintiff's cervical spine revealed "full" range of motion and no evidence of tenderness or muscle spasm.  (Tr. 437).  An examination of Plaintiff's right shoulder revealed no evidence of tenderness and "normal" shoulder contours.  (Tr. 437-38).  The doctor did, however, observe "a winging deformity of the scapula." (Tr. 437).  The AC joint was "normal" and "[r]otational movements of the right shoulder did not elicit any pain." (Tr. 437-38). Shoulder apprehension test was "negative" and Plaintiff exhibited full motor strength.  (Tr. 438). Dr. Lele concluded that "the only gross positive finding was that of a winging deformity of the right scapula." (Tr. 439).  The results of an electromyographic examination revealed "evidence of mild

right suprascapular neuropathy without denervation."  (Tr. 441-43).  Dr. Lele concluded that Plaintiff's prognosis was "good" and that Plaintiff "should continue with exercises and her shoulder should continue to improve in range of motion and strength."  (Tr. 444-45).

A March 16, 2000 examination of Plaintiff's right shoulder revealed "full" range of motion with "minimal" tenderness.  (Tr. 278).  The doctor also noted that Plaintiff's strength was "improving."  (Tr. 278).

On April 25, 2000, Plaintiff was examined by Dr. Divina.  (Tr. 272).  Plaintiff reported that her right shoulder was "much better."  (Tr. 272).  Plaintiff exhibited "full" range of motion and "improved" strength.  (Tr. 272).  The doctor concluded that Plaintiff could return to work "without restrictions."  (Tr. 272).  Plaintiff was instructed to continue her home exercise program.  (Tr. 272).

On July 5, 2001, Plaintiff was examined by Dr. Gholamreza Shareghi.  (Tr. 299-300).  Plaintiff reported that she was experiencing migraine headaches.  (Tr. 299).  The doctor observed that "the narcotics that [Plaintiff] has been taking are counter productive" because they "only increase" the occurrence of "rebound" headaches.  (Tr. 299).

On January 22, 2002, Plaintiff was examined by Dr. Divina.  Plaintiff reported that her right shoulder pain was "worsening."  (Tr. 269).  Plaintiff reported that her shoulder pain was "10/10 at its worst and 6/10 at least."  (Tr. 269).  An examination revealed that Plaintiff was "neurovascularly intact without paresthesias."  (Tr. 269).  Plaintiff was administered a cortisone injection in her right shoulder.  (Tr. 269).

On May 9, 2002, Plaintiff participated in a consultive examination conducted by Dr. Edward Westerbeke.  (Tr. 431-33).  Plaintiff reported that she was experiencing pain and restriction

6

of movement in her right shoulder.  (Tr. 431).  Plaintiff also reported experiencing migraine headaches.  (Tr. 432).  An examination of plaintiff's cervical spine revealed no evidence of deformity, tenderness, or spasm.  (Tr. 432).  An examination of Plaintiff's right shoulder revealed "no deformity" and there was "no tenderness" over the rotator cuff or the AC joint.  (Tr. 432). Phalen's sign[2] was negative and Plaintiff exhibited 5/5 grip strength on the left and 4/5 grip strength on the right.  (Tr. 433).  Dr. Westerbeke diagnosed Plaintiff with "mild adhesive capsulitis of the right shoulder."  (Tr. 433).

On May 29, 2002, Dr. Shareghi reported that Plaintiff "suffers from abnormal right shoulder pathology."  (Tr. 293).  The doctor reported that Plaintiff's shoulder impairment was "permanent" and not treatable by surgery. (Tr. 293).  Dr. Shareghi recommended that Plaintiff apply "for permanent disability."  (Tr. 293).  The doctor also concluded, however, that Plaintiff could perform "a managerial job where there would be no involvement of the right shoulder."  (Tr. 293).

On July 28, 2002, Plaintiff completed a questionnaire regarding her activities.  (Tr. 120-23).  Plaintiff reported that she cooks, washes dishes, shops, washes laundry, watches television, visits with friends and family, reads, and plays board games.  (Tr. 120-23).

On August 5, 2002, Plaintiff's friend, Nicole Barron, completed a report concerning Plaintiff's activities.  (Tr. 127-32).  Barron reported that on a "typical day" Plaintiff shops, runs errands, visits her granddaughter, reads, and plays with her dog.  (Tr. 127).  Barron reported that Plaintiff also drives, cooks, shops, talks on the telephone, "babysits," and cares for her personal needs.  (Tr. 127-32).

---

[2] Phalen's sign (or Phalen's maneuver) is a clinical test designed to detect the presence of carpal tunnel syndrome.  *See*, *e.g.*, Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Maneuver: Physical Signs of Carpal Tunnel Syndrome*, Hospital Physician, July 2000 at 39.

On November 13, 2002, Plaintiff participated in a consultive examination conducted by Dr. Bharti Sachdev. (Tr. 338-44). Plaintiff reported that she suffers from headaches that range in severity from 4-6 on a scale of 1-10. (Tr. 338-39). Plaintiff also reported that she "cannot raise her arms above the shoulders." (Tr. 338). An examination of Plaintiff's right shoulder was unremarkable and Plaintiff exhibited normal range of shoulder motion. (Tr. 340-41). Dr. Sachdev noted that Plaintiff "has gone through a lot of pain medications but still continues to use the same" which the doctor concluded raised his "suspicions for narcotic addiction." (Tr. 340). X-rays of Plaintiff's right shoulder were "negative" with no evidence of abnormality. (Tr. 346).

On April 11, 2003, Plaintiff participated in a consultive examination conducted by Dr. Paul Drouillard. (Tr. 423-28). Plaintiff reported that she was suffering from "incapacitating pain" in her right shoulder. (Tr. 424, 427). X-rays of Plaintiff's right shoulder revealed "mild degenerative changes in the right acromioclavicular joint." (Tr. 427). An examination of Plaintiff's shoulders revealed:

> no inflammation, swelling, erythema, or skin discoloration. Actively, [Plaintiff] is willing to bring the right shoulder to 90 degrees, the left to 110 degrees. Passively, [Plaintiff] can get to 180 degrees bilaterally. She can internally rotate to L1 without difficulty and externally rotate 45 degrees without a problem. There is no tenderness over the sternoclavicular joint, acromioclavicular joint, subacromial space, or bicipital groove. There is no crepitance in either shoulder and no winging of the scapulas. There is no spasm of the trapezius or rhomboid musculature. Strength testing of the upper extremities demonstrates giveaway performance, at times demonstrating no effort at all, but with repetitive testing and distraction [Plaintiff's] strength is normal. She has no weakness of the rotator cuff. Impingement test is negative, SLAP test is negative, and there is no instability in any plane. The upper arms measure 27 centimeters bilaterally and the forearms measure 24 centimeters bilaterally. There is no sign of any vasomotor instability.

(Tr. 426-27).

Following his examination, Dr. Drouillard offered the following opinion regarding

Plaintiff's condition:

> Deborah Andreas is a 48-year-old, right-hand dominant female seen today for independent orthopaedic evaluation. She complains of incapacitating pain. She remembers no specific injury. She has been off work now for four years. She made her way to the pain clinic. She is on, in my opinion, an incredible regimen of Percocet, Hydrocodone, and injectable Demerol and Vistaril. She complains of constant, burning pain in the right shoulder blade that goes to the back of her neck and front of the right shoulder. On examination, I am unable to find any objective evidence to correspond with her subjective complaints. I would like to review her MRI films personally.
>
> In my opinion, her main problem is her narcotic habituation. The chronic use of narcotics is ill advised and should be discontinued.
>
> I will update you with an addendum when I have had the chance to review her MRI films.
>
> At this point in time, I find no evidence of a work-related injury. She does have a developmental abnormality in her lumbar spine, but this has nothing to do with her employment.
>
> I think if she chose to do so, she could return to her work in her former capacity, without restriction. No further treatment is necessary. Her problem is not orthopaedic in nature.

(Tr. 427-28).

On May 2, 2003, Dr. Drouillard completed an addendum to his previous report. (Tr.

429-30). After reviewing Plaintiff's MRI films, the doctor concluded that:

> There is no tear in the rotator cuff. The labrum is intact. The biceps tendon is intact. The acromioclavicular joint appears to be normal, as does the glenohumeral joint. There appears to be some mild inflammation of the rotator cuff on the MRI films of April 20, 2000.
>
> My report remains as previously stated. It appears approximately three years ago she did have some mild inflammation of her rotator

cuff.  In the intervening time, it appears to have resolved, when I saw
her in April 2003.

(Tr. 429-30).

On June 9, 2003, Plaintiff was examined by Dr. Richard Hartman.  (Tr. 490-91).

Plaintiff reported that she was experiencing right shoulder pain.  (Tr. 490).  An examination of

Plaintiff's right shoulder revealed evidence of scapular winging and a "mild increase in overall

generalized laxity."  (Tr. 490).  X-rays of Plaintiff's right shoulder were "unremarkable."  (Tr. 490).

On December 10, 2003, Dr. Shareghi completed a report regarding Plaintiff's ability

to perform work-related activities.  (Tr. 410-13).  The doctor reported that Plaintiff suffered from

"permanent nerve damage" in her right shoulder, as well as chronic fatigue syndrome and

fibromyalgia.  (Tr. 410).  The doctor reported that Plaintiff can walk one-half to one block, sit for

20-30 minutes, and stand for 15 minutes.  (Tr. 411).  The doctor reported that during an 8-hour

workday Plaintiff can sit and stand/walk for less than 2 hours each.  (Tr. 411).  The doctor reported

that Plaintiff can "occasionally" lift less than five pounds and can "never" lift more than this amount.

(Tr. 412).

On July 9, 2004, Plaintiff participated in a consultive examination performed by

psychologist Joseph Klass.  (Tr. 514-19).  Plaintiff reported that on a typical day she prepares meals,

washes laundry, performs housework, reads, and goes shopping.  (Tr. 516).  The results of a mental

status examination were unremarkable.  (Tr. 517-19).  Plaintiff was diagnosed with generalized

anxiety disorder and post-traumatic stress disorder.  (Tr. 519).  Her GAF score was rated as 70.[3]  (Tr. 519).

On July 16, 2004, an examiner completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations.  (Tr. 521-34).  Determining that Plaintiff suffered from a generalized anxiety disorder, the examiner concluded that Plaintiff satisfied the Part A criteria for Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments.  (Tr. 522-30).  The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing.  (Tr. 531).  Specifically, the examiner concluded that Plaintiff experienced moderate restrictions in the activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation.  *Id.*

The examiner also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation.  (Tr. 535-37).  Plaintiff's abilities were characterized as "moderately limited" in one category.  (Tr. 535-36).  With respect to the remaining 19 categories, the examiner concluded that Plaintiff was either "not significantly limited" or that there existed "no evidence of limitation."  (Tr. 535-36).

On August 10, 2004, Plaintiff participated in a consultive examination performed by Dr. Gregory Baker.  (Tr. 539-42).  Plaintiff reported that she was experiencing back pain, shoulder pain, and headaches.  (Tr. 539).  Plaintiff exhibited normal range of motion in her cervical spine,

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 70 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 34.

dorsolumbar spine, and shoulders.  (Tr. 540-41).  Plaintiff's grip strength was "intact" and straight

leg raising was negative.  (Tr. 540).  Plaintiff exhibited "full dexterity" with her hands and was able

to heel/toe walk and squat without difficulty.  (Tr. 540).  Plaintiff exhibited "no loss of sensation"

and 5/5 motor strength.  (Tr. 542).  Romberg testing[4] was negative and Plaintiff exhibited no

evidence of neurological abnormality.  (Tr. 542).  Dr. Baker also observed that Plaintiff has "a

narcotic addiction" and suffers from "drug overuse headache[s]."  (Tr.542).

At the second administrative hearing Plaintiff testified that she experiences constant

pain in her right shoulder which she rated as 6-7 on a scale of 1-10.  (Tr. 670-71).  Plaintiff reported

that she suffers neck pain which ranged from 5 to 8.  (Tr. 671-72).  Plaintiff also reported that she

experiences headaches "every day," which at the outset range from 7-8 in intensity and then "get

worse or better" as the day continues.  (Tr. 673).

Dr. Brook testified at the administrative hearing that Plaintiff suffered from a mood

disorder, generalized anxiety disorder, and post-traumatic stress disorder, thereby satisfying the Part

A criteria for Section 12.04 (Affective Disorders) and Section 12.06 (Anxiety-Related Disorders)

of the Listing of Impairments.  (Tr. 692-96).  Dr. Brook further testified, however, that Plaintiff

failed to satisfy any of the Part B criteria for these particular Listings.  (Tr. 695-96).  Specifically,

the doctor testified that Plaintiff experienced moderate to less-than-moderate restrictions in the

activities of daily living, moderate to less-than-moderate difficulties in maintaining social

functioning, moderate to less-than-moderate difficulties in maintaining concentration, persistence

or pace, and never experienced episodes of decompensation.  (Tr. 695-96).

---

[4] Romberg test is a neurological test designed to detect poor balance.  *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on December 30, 2008).  The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture.  *Id.*

The following exchange also occurred between Dr. Brook and the ALJ:

ALJ:        Does the record document a history of chronic effective (sic) disorder of at least two years duration that's caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medical or psychological support in one of the following: either repeated episodes of decompensation, a residual disease process that has resulted in such marginal adjustment that even minimal increase in mental demands or a change in environment would be predicted to cause the individual to decompensate, or a current history of one or more years of inability to function outside a highly supportive living arrangement with indication of continued need for such an arrangement?

Dr. Brook:    No, sir, they do not.

(Tr. 696).

## ANALYSIS OF THE ALJ'S DECISION

### A.  Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§

---

[5]  1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.


**B.  <u>The ALJ's Decision</u>**

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) history of tendinitis of the rotator cuff and impingement syndrome of the right shoulder with scapular winging due to laxity of the tendons, which has objectively improved; (2) substance addiction disorder; (3) mood disorder, not otherwise specified; and (4) anxiety disorder, not otherwise specified.  (Tr. 24-25).  The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 25).  The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations.  (Tr. 25-27).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.


**1.  The ALJ's Decision is Supported by Substantial Evidence**

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience,

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can occasionally lift/carry 20 pounds; (2) she can frequently lift/carry 10 pounds; (3) she can stand and/or walk 6 hours during an 8-hour workday; (4) she can sit for 6 hours during an 8-hour workday; (5) she can perform simple, routine, one to three step job tasks that require occasional contact with supervisors for instructions; (6) she can occasionally engage in interpersonal interaction with co-workers; (7) she can engage in only brief and superficial contact with the public; (8) she cannot perform prolonged or repetitive rotation, flexion, or hyperextension of the neck; (9) she cannot perform repetitive pushing, pulling, gripping, or grasping activities with her right upper extremity; and (10) she cannot work around dangerous machinery or at unprotected heights. (Tr. 25). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that

a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden.  *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding.  Such was the case here, as the ALJ questioned vocational expert James Engelkes.

The vocational expert testified that there existed approximately 25,000 jobs in the lower peninsula of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 699-701).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

### a.   The ALJ Properly Assessed the Medical Evidence

As discussed above, on December 10, 2003, Dr. Shareghi completed a report regarding Plaintiff's ability to perform work-related activities.  (Tr. 410-13).  The doctor reported that Plaintiff suffered from "permanent nerve damage" in her right shoulder, as well as chronic

fatigue syndrome and fibromyalgia.  (Tr. 410).  Dr. Shareghi reported that Plaintiff can walk one-half to one block, sit for 20-30 minutes, and stand for 15 minutes.  (Tr. 411).  The doctor reported that during an 8-hour workday Plaintiff can sit and stand/walk for less than 2 hours each.  (Tr. 411).  The doctor reported that Plaintiff can "occasionally" lift less than five pounds and can "never" lift more than this amount.  (Tr. 412).  On April 13, 2005, Dr. Shareghi reported that there was "no change" in Plaintiff's status.  (Tr. 569).  Plaintiff asserts that because Shareghi was her treating physician, the ALJ was obligated to afford controlling weight to his opinion that she is impaired to an extent far beyond that recognized by the ALJ.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data."  *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

The ALJ examined Dr. Shareghi's opinion at length, properly affording it little weight. (Tr. 18-24). As the ALJ correctly observed, Dr. Shareghi's conclusion that Plaintiff suffered from "permanent nerve damage" in her right shoulder "is contradicted by objective medical testing that shows a lack of any such damage." (Tr. 20). The ALJ also noted that while Dr. Shareghi asserted that Plaintiff was also suffering from chronic fatigue syndrome and fibromyalgia, the doctor's treatment notes indicate that he never diagnosed or treated Plaintiff for any such impairments. (Tr. 20). The ALJ further determined that the extreme functional limitations articulated by Dr. Shareghi were contradicted by the objective medical evidence, the findings on examination, and Plaintiff's reported activities. (Tr. 20-21). In sum, there exists substantial evidence to support the ALJ's decision to accord less than controlling weight to Dr. Shareghi's opinion.

### b.   The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to properly assess her credibility and, furthermore, that had her "credibility been fairly and impartially assessed she would have been found to be credible and disabled." Plaintiff's argument consists of nothing more than vague boilerplate language, as she has failed to identify with any specificity the testimony or allegations which the ALJ failed to properly evaluate.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th

Cir. 1984) (emphasis added).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)).  Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531.  This standard is often referred to as the *Duncan* standard.  *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).  However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record."  *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference."  *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the

witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.  The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

       The ALJ examined the evidence of record at length, finding Plaintiff to be less than credible.  The ALJ discussed evidence suggesting that Plaintiff had attempted to get one of her doctors to provide her with a particular diagnosis for the purpose of obtaining disability benefits.  (Tr. 24, 574-76).  The ALJ noted that Plaintiff's therapist had questioned Plaintiff's credibility, in light of Plaintiff's "very very dishonest" statements regarding her reasons for participating in therapy.  (Tr. 24, 603).  As the ALJ also correctly observed, Plaintiff's subjective allegations of disability are contradicted by the medical evidence, as well as her reported activities.  (Tr. 24-26).  The Court finds, therefore, that there exists substantial evidence to support the ALJ's credibility determination.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: January 6, 2009                     /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge

21